IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CYNTHIA FLANAGAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-CV-36-JHP-SAJ |
| ) | |
| METROPOLITAN LIFE INSURANCE, ) | |
| METLIFE DISABILITY and ) | |
| HOME DEPOT U.S.A., INC., ) | |
| ) | |
| Defendants. ) | |

**ORDER and OPINION**

Plaintiff Cynthia Flanagan brought this action challenging Defendant Metropolitan Life Insurance Company's denial of disability benefits under the Home Depot Welfare Benefits Plan. The parties agree that the Plan is subject to and governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* (ERISA). Accordingly, the parties submitted briefs addressing the merits of Plaintiff's claim, as well as the Administrative Record in the case.

Because ERISA applies, the Court treats the claim as an appeal. *See* Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 62-63 (1987). Specifically, the Court conducts an administrative review, which is confined to the administrative record in the case. *See, e.g.,* Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 380 (10th Cir. 1992) (requiring district courts to limit their review to the arguments and authorities submitted to or considered by the plan's decision-maker at the time of its decision). "[A] denial of benefits challenged under [ERISA] § 1132(a)(1)(B) . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). In the latter instance, the Court must employ the "arbitrary and capricious" standard of review. Fought v.

1

UNUM Life Ins. Co. of Am., 379 F.3d 997, 1002-03 (10th Cir. 2004).

Here, the parties agree that Metropolitan Life Insurance Company (MetLife) has discretionary authority under the Plan to determine eligibility for benefits, such that the "arbitrary and capricious" standard applies.  Under this standard, the Court's inquiry is limited to "whether the plan administrator's interpretation was reasonable and made in good faith." Id. at 1003 (quoting Hickman v. GEM Ins. Co., 299 F.3d 1208, 1213 (10th Cir. 2002)) (internal alterations omitted).  However, because the claims administrator here is also the insurer of the plan, the Court applies a "less deferential" standard to account for the inherent conflict of interest in such a situation.  *See* id. at 1006.  MetLife therefore "bears the burden of proving the reasonableness of its decision pursuant to [the] traditional arbitrary and capricious standard." Id. The Court must then "take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest."  Id.

Ultimately, in order to affirm the administrator's decision, the Court must find "[s]ubstantial evidence . . . that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker.  Substantial evidence requires more than a scintilla but less than a preponderance."  Sandoval, 967 F.2d at 382.  In other words, MetLife's decision

> need not be the only logical one nor even the best one.  It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious . . . .  The decision will be upheld unless it is not grounded on any reasonable basis . . . The reviewing court need only assure that [its] decision falls somewhere on the continuum of reasonableness – even if on the low end.

Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999).  Thus, this Court must uphold Defendant's decision so long as it is supported by "substantial evidence," Sandoval, 967 F.2d at 382, and may only reverse Defendant's decision if it was not grounded on "any reasonable basis,"  Kimber, 196 F.3d at 1098.

Upon review of the Administrative Record in the instant case, the Court finds as follows:

Plaintiff Cynthia Flanagan worked for The Home Depot as a decor consultant, a job classified as "light duty" which required lifting and carrying negligible weight constantly, 10 pounds frequently, 20 pounds occasionally, as well as long periods of standing and walking. On July 15, 2003, Flanagan injured her back while lifting and moving boxes in her home. Her last day of work at The Home Depot was July 17, 2003.

Under the terms of the Plan, Plaintiff could qualify for short-term disability benefits if the disability resulting from her injury lasted more than fourteen days, and rendered her unable to perform any of the material duties of her regular job. In order to qualify for long-term benefits, Plaintiff must establish that she is unable to perform the material duties of her regular job, or those of any gainful occupation for which she is otherwise qualified by training, education and experience. All claims must be supported by appropriate medical documentation.

The Record is somewhat unclear about what medical documentation Plaintiff provided to MetLife and when. Basic information – such as doctor's notes to excuse Plaintiff from work – was provided from the date of injury until September 29, 2003, when MetLife specifically requested office notes, diagnostic test results, and other objective findings which Plaintiff and/or her doctors had not yet submitted. After that time, Plaintiff apparently provided office notes from her primary care physician, Dr. Baldwin, which may have included progress reports from the neurosurgeon, Dr. Marouk, who consulted on Plaintiff's case, as well as the chiropractor, Dr. Mead, who treated Plaintiff. On October 15, 2003, MetLife sent Plaintiff a letter approving her disability status from July 17 through August 25, 2003, but terminating benefits after that time because of insufficient medical findings. Plaintiff then submitted additional documentation on appeal. On December 15, 2003, MetLife sent Plaintiff a letter affirming the termination of benefits as of August 25, 2003, because its medical examiner determined on appeal that the

available medical evidence did not support Plaintiff's alleged inability to work, and that restrictions noted for Plaintiff were not supported by objective findings and/or anatomic reasons. Plaintiff then initiated the instant lawsuit.

Plaintiff repeatedly decries MetLife's supposed conclusion that "no disability has been shown" [Response Brief at 2] and its finding of "a lack of restrictions or limitations," [id. at 9]. However, Plaintiff mischaracterizes MetLife's findings. MetLife did not cite "lack of disability" or "lack of restrictions"as reasons for terminating Plaintiff's disability benefits. Instead, MetLife terminated the benefits Plaintiff received from July 17 to August 25, 2003, due to a lack of appropriate medical documentation to support Plaintiff's alleged inability to perform any of the essential tasks of her job or any other job past that point, according to the standards set forth in the Plan. Based on its careful review of the Administrative Record and the arguments presented by the parties, the Court finds MetLife's decision in this regard was reasonable. The Court further finds more than a "scintilla" of evidence to support the reasoning behind the denial. Specifically, from its review of the medical records, the Court discerns the following:

After her injury on July 15, 2003, Plaintiff sought treatment for back pain from her primary care physician, Dr. Baldwin, on July 21, 2003, and followed up with him on July 28, 2003, at which time he noted that an MRI revealed "mild" degeneration, with a bulging disk at the L3-L4 level, but no compression. Dr. Baldwin noted that these findings were not equal to Plaintiff's subjective complaints. Dr. Baldwin referred Plaintiff to the neurosurgeon, Dr. Marouk, for further evaluation. Dr. Baldwin also provided Plaintiff with notes to the effect that her "condition" caused her absence from work from July 17 to July 28, 2003, and again from July 28 to August 13, 2003.

Dr. Marouk's initial impression of Plaintiff's condition on August 13, 2003, was that she suffered from degenerative disk disease and a bulging disk. He classified her as totally

4

temporarily disabled because her pain was "too severe" for her to work, and recommended physical therapy, chiropractic care, and pain medication. Dr. Baldwin then provided Plaintiff with another note excusing her absence from work between August 13 and August 22, 2003, due to her "condition."

Dr. Marouk sent Dr. Baldwin a letter indicating that Plaintiff should be classified as temporarily totally disabled from August 22, 2003 until her next appointment with him on September 5, 2003. Plaintiff, however, apparently did not receive a note excusing her absence from work for those dates. During that time, Plaintiff was treated by a chiropractor, Dr. Mead. Dr. Mead noted Plaintiff's "long history of low back symptoms." He performed several tests, including reflexes, straight leg raise, Goldthwaite, Braggard, Nachlas/Ely, Fabre Patrick tests, and ultimately concluded that Plaintiff could sit, stand, and walk "intermittently" as tolerated, as well as drive, but she could not lift, climb, twist, bend, stoop, or reach above shoulder level. Although he estimated that Plaintiff's disability could last as long as two to four months, Dr. Mead did not note specific dates for such restrictions, or provide Plaintiff with a note excusing her absence from work for any period of time.

After following up with Plaintiff, Dr. Marouk sent a letter to Dr. Baldwin on September 24, 2003 stating that he had "no good anatomic explanation" for Plaintiff's pain, "no surgical recommendations," and "no other treatment options" for her. Dr. Marouk noted that he was unable to identify any root impingement or significant disk disease, and that a bone scan he had ordered came back "completely normal."

Otherwise, Plaintiff visited Dr. Baldwin on October 1, 2003, to have her blood pressure checked. Apparently, her back condition was not discussed at this visit. On October 6, 2003, Dr. Baldwin noted that Plaintiff had a recent "trigger injection" but was still in pain, and assessed her condition as "lumbar strain." On October 13, 2003, Dr. Baldwin provided Plaintiff

with a note to the effect that her "condition" would cause Plaintiff's indefinite absence from work from that date forward. This note, like other notes tendered by Dr. Baldwin, did not cite any specific limitations, restrictions or diagnoses to support Plaintiff's inability to work.

The final medical assessment in the Record is the Physical Capabilities Evaluation performed by Dr. Baldwin on November 12, 2003. The evaluation appears to have been done only for purposes of Plaintiff's appeal, and not as part of Plaintiff's ongoing care. On this form, Dr. Baldwin indicated that Plaintiff could sit, stand and walk as tolerated and/or with breaks after one hour, but she could not lift, push, pull or do fine manipulation with her hands, do repetitive motions with her feet, bend, squat, crawl, climb, reach, or drive. Dr. Baldwin classified all restrictions as permanent, but noted that Plaintiff could gradually increase her work hours to see how much she could do.

Overall, while the Record is certainly replete with references to Plaintiff's complaints of pain, objective findings regarding the source of said pain are scarce. Indeed, Dr. Baldwin specifically noted that Plaintiff's complaints exceeded the level of degeneration identified by the MRI, and Dr. Marouk likewise could not find any "good anatomic reason" for Plaintiff's pain. In such cases, "it [is] not unreasonable for the administrator [of the benefits plan] to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator." Maniatty v. UNUMProvident Corp., 218 F. Supp. 2d 500, 504 (S.D. N.Y. 2002); *see also* Sumner v. Cont'l Cas. Co., 2006 U.S. Dist. LEXIS 17473 at *19 (N.D. Okla. March 23, 2006) (citing Aboul-Fetouh v. Employee Benefits Committee, 245 F.3d 465, 473 (5th Cir. 2001) for the proposition that an administrator does not abuse its discretion to deny benefits for lack of evidentiary support, "despite the fact that there is no known etiology for chronic pain, and therefore no way

6

to conclusively establish disabling pain with objective medical evidence") (internal quotations and alterations omitted).  The conclusory statements by Plaintiff's doctors that she was totally disabled may therefore be properly discounted, because they are not supported by any medical explanation for her pain.  *See* Jones v. Cont'l Cas. Co., 35 F. Supp. 2d 1304, 1307-08 (D. Kan. 1999), *aff'd*, 203 F.3d 835 (10th Cir. 2000) ("[I]n the absence of a correlation between [the doctor's] conclusory determination that [the plaintiff] was totally disabled and an explanation for this drastic diagnosis or an indication that he understood the nature of the occupation from which he concluded she was totally disabled, the court accords little weight to [the doctor's] assessment.").  For all the foregoing reasons, the Court finds in favor of Defendants.

   IT IS SO ORDERED this 5th day of September, 2006.

_____
James H. Payne
United States District Judge
Northern District of Oklahoma

7